IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SURTEK, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 1:25-cv-00296-ADA-SH |
| | § | |
| MOJDEH DELSHAD; | § | |
| MATTHEW BALHOFF; | § | |
| THE UNIVERSITY OF TEXAS | § | |
| AT AUSTIN; AND | § | |
| CHRISTINA MELTON | § | |
| CRAIN, JODIE LEE JILES, | § | |
| KELCY L. WARREN, | § | |
| KEVIN P. ELTIFE, NOLAN PEREZ, | § | |
| STUART W. STEDMAN, | § | |
| JANIECE LONGORIA, | § | |
| JAMES C. "RAD" WEAVER, AND | § | |
| ROBERT P. GAUNTT, IN THEIR | § | |
| OFFICIAL CAPACITY AS MEMBERS | § | |
| OF THE BOARD OF REGENTS OF | § | |
| THE UNIVERSITY OF TEXAS | § | |
| SYSTEM, | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF SURTEK, INC.'S FIRST AMENDED COMPLAINT[1]

Plaintiff, Surtek, Inc. (Surtek), through its undersigned counsel, hereby issues its

First Amended Complaint against Defendants, Mojdeh Delshad (Dr. Delshad), Matthew

Balhoff (Dr. Balhoff), the University of Texas at Austin (UT Austin), and the following

individuals in their official capacity as members of the Board of Regents of the University

of Texas System (UT System Board of Regents): Christina Melton Crain, Jodie Lee Jiles,

---

[1] Plaintiff Surtek, Inc. amends its complaint as a matter of course pursuant to Federal Rule of Civil 15(a)(1)(B) and W.D. Local Rule CV-15(b).

Kelcy L. Warren, Kevin P. Eltife, Nolan Perez, Stuart W. Stedman, Janiece Longoria, James C. "Rad" Weaver, and Robert P. Gauntt.  Surtek would respectfully show the following in support.

## I.    PARTIES

1.    Plaintiff Surtek is a corporation organized under the laws of the State of Colorado, with its principal place of business located at 10940 S. Parker Road, Suite 833, Parker, Colorado 80134.

2.    Dr. Delshad is an individual and a citizen of the State of Texas.  Dr. Delshad has appeared in this lawsuit and may be served by and through her counsel of record, William H. Farrell, General Litigation Division for the Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548 (biff.farrell@oag.texas.gov).

3.    Dr. Balhoff is an individual and a citizen of the State of Texas.  Dr. Balhoff has appeared in this lawsuit and may be served by and through his counsel of record, William H. Farrell, General Litigation Division for the Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548 (biff.farrell@oag.texas.gov).

4.    UT Austin is a public educational institution authorized by Article 7, Section 10 of the Texas Constitution and funded by the State of Texas.  UT Austin is under the management and control of the UT System Board of Regents.  UT Austin's principal office is located in Austin, Texas.  Defendant UT Austin has appeared in this lawsuit and may be served by and through its counsel of record, William H. Farrell, General Litigation Division for the Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548 (biff.farrell@oag.texas.gov).

5.     Christina Melton Crain, Jodie Lee Jiles, Kelcy L. Warren, Kevin P. Eltife, Nolan Perez, M.D., Stuart W. Stedman, Janiece Longoria, James C. "Rad" Weaver, and Robert P. Gauntt, are the nine members of the UT System Board of Regents, the governing body of the University of Texas System.  The UT System Board of Regents is responsible for the central management and coordination of the University of Texas System's component institutions.  The UT System Board of Regents members are all named Defendants in their official capacities only.  The UT System Board of Regents have appeared in this lawsuit and may be served by and through his counsel of record, William H. Farrell, General Litigation Division for the Office of the Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548 (biff.farrell@oag.texas.gov).

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States – specifically, the federal Defend Trade Secrets Act in 18 U.S.C.A. § 1836(c).

7.     Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

8.     All conditions precedent to the filing of this lawsuit have occurred or have been waived.

- 3 -

### III.    FACTUAL ALLEGATIONS

**A.    Surtek's Business; Pitts' and Wyatt's Employment.**

9.    Surtek is a boutique enhanced oil recovery (**EOR**) engineering and lab service provider located in Parker, Colorado.

10.    Surtek provides its clients with a range of services, including reservoir screening, chemical EOR formulation design (fluid-fluid studies such as preparation rheology and fluid rock studies), oil recovery, coreflooding, retention measurements, minimum miscible pressure determination, numerical simulation, and consulting.

11.    Surtek has been offering these services since 1978, when the company was founded by Harry Surkalo, a well-respected member of the EOR sector of the oil and gas industry, who is an engineer with only a bachelor's degree and decades of practical field experience not obtained in textbooks.

12.    Harry Surkalo and Surtek are regarded as pioneers in the use of chemicals, such as alkali, surfactants, and polymers, for enhanced oil recovery, particularly for their efforts in bringing chemical costs down.

13.    The sector of chemical enhanced oil recovery is very competitive among a small niche of companies.

14.    Each company has its own methods of designing projects for their clients. Surtek is well known for its focus on practical designs, while other companies are better known for academic designs focusing on deep technical theory.

15.    The value of Surtek's trade secrets, methodologies, processes, and data discussed herein stems from Surtek's efforts to keep designs practical (rather than

academic) and build on the unique data from its more than 45 years of experience (the "**Practical Design Trade Secrets**").

16.    Additionally, since 2016, Surtek has actively developed its capabilities in predictive analytics, making significant investments in: (1) personnel and partnerships to enhance its technological infrastructure; (2) education and training, including digitization and cleaning of its proprietary datasets; and (3) marketing and outreach, notably through teaching college and industry courses on petroleum data analytics (the **Predicative Analytics Trade Secrets**) (together, the Practical Design Trade Secrets and Predicative Analysis Trade Secrets will be referred to as "**Surtek's Trade Secrets**")..

17.    Dr. Malcom J. Pitts (**Dr. Pitts**) was employed by Surtek from 1980 to 2022. Dr. Pitts served as the President of Surtek between 2016 and 2019, during which time he owned 51% of Surtek's stock.

18.    Kon Wyatt, III (**Wyatt**) was employed by Surtek until July 2020, after which he served as an unpaid advisor. Before July 2019, Wyatt was the owner of 49% of Surtek's stock.

19.    In July of 2019, Dr. Pitts and Wyatt sold the entirety of their Surtek stock but remained as Surtek employees. Unbeknownst to Surtek's new ownership, Dr. Pitts and Wyatt had ulterior motives that would soon cause significant financial harm to Surtek. Indeed, Dr. Pitts expressed that "the only reason I would continue [to work for Surtek] would be to have access to the S Drive information."

20.     During his employment, Surtek entrusted Dr. Pitts with access to the company's confidential and proprietary information and trade secrets, including information pertaining to Surtek's operations, customer and candidate relationships, proposals, pricing strategy, and other information relating to Surtek's competitive advantages in the oil and gas market.

21.     All Surtek employees are required to sign a non-disclosure agreement (NDA), which was created by Dr. Pitts and remains in use by Surtek.

22.     The NDA stipulates that the employee agrees not to "use for others, or myself or disclose or divulge to others including future employees, any trade secrets, confidential information, or any other proprietary data of the Company in violation of this Agreement" both "during" and "at any time after the termination of my employment with the Company."

23.     The NDA defines Surtek's Trade Secrets as including technical information, such as "methods, processes formulae, compositions, systems, techniques, inventions, machines, computer programs and research projects," as well as business information, such as "customer lists, pricing data, sources of supply, financial data and marketing, production, or merchandising systems or plans."

24.     Furthermore, the NDA stipulates that, upon termination of employment from Surtek, the employee "shall return to the Company all documents and property of the Company" and agrees not to retain "copies, notes or abstracts" relating to any company documents or property.

25.    Dr. Pitts and Wyatt signed the NDA. Both possessed actual knowledge of their duty of non-disclosure.

**B.    Surtek's Contracts with Kuwait Oil Company**

26.    Chemical EOR is a niche market with a limited number of players. Surtek and Defendant UT Austin (as is further described below) are the leading figures in the industry.

27.    The country of Kuwait is an ideal candidate for chemical EOR and has announced a $400 billion investment plan through 2040 towards the development of its mature fields. Kuwait Oil Company (**KOC**) invested hundreds of millions of dollars in pilots of EOR technologies, targeting this lucrative opportunity, requesting Surtek's practical processes of design, ideology, and integral trade secrets.

28.    From 2015 to 2020, Surtek held contracts with KOC with a value of approximately $12,000,000.

29.    During this period, Surtek's primary technical contact at KOC was Mohammed Al-Murayri (**Dr. Al-Murayri**), who was a Yemeni-Canadian engineer. Drs. Pitts and Al-Murayri maintained a close relationship while Surtek contracted with KOC.

30.    In August of 2019, KOC expressed a desire to continue working with Surtek on future laboratory engineering projects.

31.    In January of 2020, Surtek and KOC had a meeting. KOC outlined seven new contracts they wished to establish, covering laboratory services, engineering, and collaborative research with KISR (Kuwait Institute for Scientific Research).

32.    In March of 2020, Surtek's new ownership met with KOC, including Dr. Al-Murayri, to inform them of the ownership change and to initiate discussions with KISR on laboratory and data analytics work related to chemical EOR.

33.    After the March 2020 meeting, Dr. Pitts and Dr. Al-Murayri began to alter the intended scope of Surtek's engagement with KOC.

34.    The KISR collaboration was terminated, and Surtek was suddenly directed to work with the University of Kuwait.

35.    Surtek's new management was led to believe the engagement with the University of Kuwait would be a low-cost academic contract to help the university in coreflood experiments, focusing on the UNLF reservoir developed by UT Austin's Dr. Delshad.

36.    During this time, Kuwait University expressed interest in obtaining certain of Surtek's Trade Secrets from Surtek, including knowledge on how to conduct practical project design, as well as access to Surtek's internal spreadsheets to assist them in creating their own.

37.    Dr. Pitts, who Surtek still employed, proposed that Surtek provide all its internal laboratory spreadsheets to Kuwait University—something Surtek had never done before and something that Surtek's new owners rejected.

38.    Surtek terminated Dr. Pitts in September 2022. Following his termination, Surtek discovered that he had actively worked to sabotage Surtek with the help and cooperation of Defendants.

### C.    University of Texas Is a Competitor of Surtek

#### a.    *Ultimate EOR*

39.    UT Austin became a competitor of Surtek around 2006, when UT Austin initiated its Joint Industry Project (JIP).  In a webinar posted by the UT Austin CPGE and featuring Dr. Delshad and Dr. Balhoff, UT Austin CPGE boasted the following Chemical EOR Project Sponsors, including KOC and other foreign oil companies:[2]



40.    While several of these member companies have ceased partnering with UT Austin, UT Austin continues to partner with foreign oil companies, such as Cairn India/Vedanta Limited, China National Offshore Oil Corporation (CNOOC), and Sinopec.[3]

41.    In 2013, Dr. Delshad, Dr. Gary Pope and Dr. Upali P. Weerasooriya launched Ultimate EOR to commercialize chemical EOR technology developed at the

---

[2] "Nov 2015: Chemical EOR: What's New, What Works, Where to Use It."
https://youtu.be/B3aCNPqnZIw?si=9wVBtDQoICU6F6YD.
[3] https://csee.engr.utexas.edu/research/industrial-affiliate-programs/chemical-enhanced-oil-recovery.

University of Texas at Austin. Notably, while Dr. Pitts was still employed at Surtek, Dr. Al-Murayri disclosed to Dr. Pitts that UT Austin owned a five percent (5%) interest in Ultimate EOR.

42.    As a direct competitor to Surtek, Ultimate EOR provides EOR services, including laboratory studies, reservoir engineering, modeling studies, chemical design, chemical quality control, chemical procurement, and field technical support. Since its inception, Ultimate EOR has expanded its business to include North America, the Middle East, Europe, Asia, Africa, and South America.

43.    On its website, Ultimate EOR identifies UT Austin as one of its Partners[4] and UT Austin lists Ultimate EOR as one of its "Member Companies" for its Chemical Enhanced Oil Recovery Research Project.  Ultimate EOR's "Global Client Pool" includes KOC.[5]

    b.  *UTCHEM*

44.    In addition to Ultimate EOR, UT Austin has developed a sophisticated software tool for EOR simulation known as UTCHEM. It is a three-dimensional, multicomponent, multiphase chemical compositional reservoir simulator designed to model complex EOR processes. Its primary purpose is to enhance oil recovery from reservoirs by simulating a variety of chemical flooding techniques such as polymer flooding, surfactant flooding, alkaline flooding, combination flooding, as well as other microbial and thermal methods. The software serves as a critical tool for understanding

---

[4] "Our Clients & Partners." https://www.ueors.com/clients-partners.
[5] "Our Clients & Partners." https://www.ueors.com/clients-partners.

how chemicals interact with reservoir fluids and porous media, thereby improving oil displacement and recovery efficiency.

45.    UTCHEM is widely utilized in both academic research and practical applications within the oil and gas industry. Its key uses include: (1) a simulation of EOR processes to predict effectiveness of various chemical flooding methods under different reservoir conditions; (2) the optimization of EOR strategies by modeling fluid properties, injection, schemes, and reservoir responses; (3) the development of innovative EOR techniques by academic institutions through the investigation of chemical interactions; (4) enabling oil companies to design and evaluate EOR projects; and (5) enabling users to assess how changes in parameters (*e.g.,* chemical concentration and injection rates) impact recovery outcomes.

46.    UTCHEM is licensed through the University of Texas at Austin's Office of Technology Commercialization. Specific fees are not publicly disclosed and appear to vary depending on the user's intended use (academic vs. commercial use). UTCHEM has a number of users in EOR research and implementation, including oil and gas companies, academic institutions, research centers, and service providers.

47.    UTCHEM operates in a competitive landscape with several established reservoir simulation software packages, particularly for EOR. Key competitors include CMG's STARS, Schlumberger's ECLIPSE, and Haliburton's Nexus. Compared to these commercial alternatives, UTCHEM is particularly distinguished for its advanced modeling of chemical flooding processes, making it a preferred choice for projects

requiring detailed simulation of surfactant-polymer interactions and geochemical reactions.

### D.    Defendants "Launder" Surtek's Trade Secrets Through UT Austin

#### a. Dr. Pitts Sends Defendants Surtek's Trade Secrets

48.    As alluded to above, Dr. Pitts took actions to sabotage Surtek with the help of the Defendants.

49.    Indeed, without authorization from Surtek, Dr. Pitts acquired and transmitted significant amounts of Surtek's Trade Secrets to Dr. Al-Murayri, Mohammad Abdullah (**Abdullah**), and Dr. Delshad.

50.    On information and belief, Dr. Delshad, Abdullah, and Dr. Al-Murayri knew that Surtek had been sold to new owners, who would have to authorize Dr. Pitts to transmit Surtek's Trade Secrets outside of the company, but never questioned why the new owners were not included on the following transmissions of confidential and proprietary information:

>    a.    On January 22, 2021, Mr. Abdullah emailed Dr. Pitts and carbon copied Dr. Al-Murayri and Dr. Delshad, requesting Surtek and KOC polymer data developed within a confidential business relationship.  Dr. Pitts sent information not only developed by Surtek solely for KOC but also raw data, formulae, processes, and other information to which KOC was not entitled. That information was proprietary and solely owned by Surtek.

>    b.    On February 4, 2021, Dr. Pitts emailed Mr. Abdullah, as well as carbon copied to Dr. Al-Murayri and Dr. Delshad, transmitting four (4) files of Surtek's procedural and evaluative data reports created for SALB, RAMA, SAUB, and Minagish oil field projects.

>    c.    On March 2, 2021, Dr. Pitts emailed Mr. Abdullah, as well as carbon copied to Dr. Al-Murayri and Dr. Delshad, transmitting ninety-eight (98) files pertaining to Surtek's Minagish oil field operations containing no fewer

than twenty-five (25) of Surtek's Trade Secrets detailing how to conduct practical laboratory design.

d. On March 3, 2021, Dr. Pitts emailed Mr. Abdullah, as well as carbon copied to Dr. Al-Murayri and Dr. Delshad, transmitting three hundred fifty-four (354) files pertaining to Surtek's Raudhatain oil field operations containing no fewer than thirty-eight (38) of Surtek's Trade Secrets detailing how to conduct practical laboratory design.

e. On March 4, 2021, Dr. Pitts emailed Mr. Abdullah, as well as carbon copied to Dr. Al-Murayri and Dr. Delshad, transmitting one hundred and forty-three (143) files pertaining to Surtek's Sabriyah oil field operations and SAUB operations containing no fewer than eighty-five (85) of Surtek's Trade Secrets detailing how to conduct practical laboratory design.

f. On June 23, 2021, Dr. Pitts emailed Mr. Abdullah, as well as carbon copied to Dr. Al-Murayri and Dr. Delshad, transferring five (5) files pertaining to Surtek's SAUB operations containing at least one (1) of Surtek's Trade Secrets on how to conduct practical laboratory design.

51.    Through these transmissions, Dr. Pitts wrongfully provided Defendants with hundreds of Surtek's Trade Secrets that were under NDA protection and had never been shared with anyone outside of Surtek. These trade secrets included the following:

a. **Proprietary Process Spreadsheet**. For over forty (40) years, Surtek has developed a proprietary process spreadsheet. Surtek and its team members have made (and continue to make) refinements to this spreadsheet through iterative improvements and contributions. The spreadsheet represents a comprehensive, proprietary tool for designing and conducting enhanced oil recovery projects. The combination of Surtek's spreadsheet, methodologies, processes, and historical data (which had been accumulated for more than forty years) creates a significant competitive barrier for any newcomers to the marketplace. For these trade secrets to fall into the hands of a competitor, it would enable the competitor to replicate Surtek's work and provide clients with efficient and effective EOR project execution that would have otherwise required decades of trial and error to replicate. This explains Kuwait University's rapid market entry (discussed more below) after Defendants provided it with access to Surtek's proprietary information.

b. **Operational Efficiency Methodology**. Within the Proprietary Process Spreadsheet, there is a specific "tab" titled "What's the Value?" that outlines critical procedures, measurements and checks, ensuring that only essential

tasks are performed. The methodology provides explicit instructions for how to streamline operations. Surtek's methodology was specifically designed to simplify complex tasks to enable personnel without advanced degrees to achieve accurate, reliable results efficiently that, in turn, allowed the lab to run at much lower costs.

c. **Economic Analysis Integration.** Within the Proprietary Process Spreadsheet, there is a specific "tab" titled "Economic Summary" that integrates economic considerations into laboratory and project design processes. This function is unique in its application to EOR laboratory work and sets Surtek apart from its competitors (*e.g.*, UT Austin) because the competitors do not incorporate economics into similar workflows. This function enhances decision making by balancing technical feasibility with cost-effectiveness—a proprietary approach developed by Surtek.

d. **Report Generation Process**. This process is a methodology that uses Grapher software to transform raw Excel data from spreadsheets into polished, professional reports (*e.g.*, 600-700 page documents). The process combines simple spreadsheet data with sophisticated presentation techniques, resulting in error-free, comprehensive reports that are superior to Surtek's competitors' outputs.

e. **Transparency in Data Presentation**. This policy and methodology are embedded in the Surtek's report generation process to present all data, including failures, rather than only successful outcomes. Surtek's competitors, like UT Austin and Ultimate EOR, do not utilize this methodology.

f. **Real-World Project Data**. Proprietary data from practical, commercial EOR projects, including the Sabriyah Lower Burgan, Minagish, Raudhatain, and Sabriyah Upper Burgan. This data includes statistically significant measurements from real-world applications of hydrophobically associating polymers (designed for high temperature and salinity), not theoretical or academic data. The data was exclusively generated for Surtek and KOC, making it uniquely valuable for its practical, commercial application.

52.    On information and belief, Defendants conspired with Abdullah and Dr. Al-Murayri to "launder" Surtek's Trade Secrets by improperly disseminating them through UT Austin to hide the misappropriation from discovery and shield themselves under the cloak of sovereign immunity.

53.     Once scrubbed through the educational institution, Defendants could benefit from using Surtek's Trade Secrets in both academic and commercial endeavors, including interstate and foreign commerce, and try to avail themselves of the shield of sovereign immunity.

b. *Defendants Used Surtek's Trade Secrets and Proprietary Information to Launch a Competitor*

54.     For example, on information and belief, Dr. Pitts' transmissions of Surtek's Trade Secrets were utilized by Defendants, Abdullah, and Dr. Al-Murayri to build up a new competitor in the chemical EOR space to take advantage of Kuwait's lucrative investment opportunity—Kuwait University Lab Services (**KU Lab Services**).

55.     When Dr. Pitts' transmittals were made, Abdullah was a PhD candidate at UT Austin and a postgraduate scholar at Kuwait University.

56.     On information and belief, Dr. Al-Murayri recruited Kuwaiti and other Middle Eastern students (such as Abdullah) to attend UT Austin programs, using his relationship with Dr. Delshad, and promised those students easy PhD paths.

57.     On information and belief, at the time of Dr. Pitts' transmissions, Dr. Al-Murayri remained an adjunct professor for UT Austin and sat on Abdullah's PhD committee.

58.     On information and belief, Dr. Al-Murayri and Dr. Delshad trained Abdullah and assisted him with his dissertation in preparation for creating the KU Lab Services, as Abdullah was required to obtain a PhD to manage a laboratory.

59.     Abdullah has since graduated from UT Austin and works as an assistant Professor at Kuwait University in Kuwait City, Kuwait.  Kuwait University is the only public university in Kuwait, and the Kuwaiti government funds it.

60.     KU Lab Services was formed following Dr. Pitts' wrongful transmissions of Surtek's Trade Secrets set forth hereinabove.

61.     At the time Abdullah acquired Surtek's Trade Secrets, Kuwait University did not possess the capability to offer EOR lab services.

62.     After receiving Surtek's proprietary information, however, Kuwait University rapidly developed a full suite of EOR services that, not surprisingly, mirrored those of Surtek.

63.     Abdullah is the head of KU Lab Services and has leveraged the misappropriated data he acquired from Dr. Pitts and the Defendants to structure Kuwait University's offerings, compete with Surtek, and take away Surtek's client contracts.

64.      In a recent social media post featuring a photograph of Abdullah and KOC employees, Kuwait University specifically referred to its intention to foster strong ties with industry leaders, such as KOC, a client of Surtek.

65.     In another post, Kuwait University announced a research project with KOC, describing the exact same services Surtek has historically provided to KOC. Surtek has since lost KOC contracts to KU Lab Services worth millions of dollars.

        c.   *Defendants Used Surtek's Trade Secrets and Proprietary Information to Aid Their Research and Improve Their Models.*

66.     By way of further example, on information and belief, Abdullah, Dr. Balhoff, Dr. Al Murayri, and Dr. Delshad collected Surtek's Trade Secrets for use in their research,

despite knowing that Dr. Pitts was not authorized to send the materials as they were outside Surtek.

67.    Dr. Delshad is a research Professor in the Department of Petroleum and Geosystems Engineering at UT Austin.[6]

68.    Importantly, Dr. Delshad is also a founder and the initial president of Ultimate EOR, a direct competitor of Surtek.

69.    Dr. Delshad served as the Vice President (2013-2014) and President/Chief Executive Officer (2015-2019) of Ultimate EOR.

70.    On information and belief, Dr. Delshad was terminated by Ultimate EOR in or around 2019, which provided Dr. Delshad with an incentive to work with Dr. Al Murayri and Abdullah to acquire trade secrets from chemical EOR companies such as Surtek to both build up KU Lab Services with misappropriated trade secrets and utilize the data within UT Austin to keep it at the forefront of AI models for polymer EOR.

71.    Dr. Balhoff is the Department Chair and a Professor in UT Austin's Department of Petroleum and Geosystems Engineering (UT PGE).[7]

72.    Dr. Balhoff is also the Director of UT Austin's Center for Subsurface Energy and the Environment (UT CSEE). [8]

73.    On information and belief, Surtek and KOC were the only two companies in the world that had access to the latest polymer lab data for the four harsh (high temperature, high salinity) Kuwaiti reservoirs' results for AI model calibration.

---

[6] https://www.pge.utexas.edu/faculty-and-staff/mojdeh-delshad/
[7] https://www.pge.utexas.edu/faculty-and-staff/matthew-balhoff/.
[8] https://www.pge.utexas.edu/pge-news/balhoff-named-next-pge-chair/.

74.    Dr. Al-Murayri, as a KOC employee, knew he did not have the right to disclose this data, so he used Dr. Pitts as a mechanism through which to have the data provided to UT Austin, Kuwait University, and his personal database.

75.    After Dr. Pitts transferred Surtek's Trade Secrets, Dr. Delshad and Dr. Balhoff co-authored a paper with Mr. Abdullah and Dr. Al- Murayri titled "Physics-Based and Data-Driven Polymer Rheology Model."

76.    This report was peer reviewed and published by the Society of Petroleum Engineers in 2023.

77.    On information and belief, each of the authors knew Surtek's Trade Secrets were acquired wrongfully when they wrote the paper.  Indeed, the paper does not mention Surtek in its references or otherwise acknowledge Surtek.   Instead, the data misappropriated from Surtek is referred to as being obtained from "commercial laboratories."

78.    As they explain in the paper, Dr. Delshad, Dr. Balhoff, and the other authors built an artificial intelligence (AI) or machine learning (ML) model: "This study benchmarks the existing polymer empirical and machine learning (ML) models against a new data-driven model with some physics basis for common synthetic polymers."[9]

79.    Defendants Dr. Delshad and Dr. Balhoff fed Surtek's data into that AI model: "…the data considered to train the empirical models are only from Al-Hamairi and AlAmeri (2020) and <u>commercial laboratories</u>."[10]

_____

[9] M.B. Abdullah, M. Delshad, K. Sepehrnoori, M.T. Balhoff, J.T. Foster, and M.T. Al-Murayri, *Physics-Based and Data-Driven Polymer Rheology Model*, 28 SPE J. 1857, 1857 (2023).
[10] *Id.* at 1863.

80.    Dr. Pitts, Dr. Delshad, Dr. Al-Murayri, and other individuals with UT Austin were aware of Surtek's Predicative Analytics Trade Secrets and, more importantly, the value of Surtek's proprietary data and trade secrets.

81.    By wrongfully appropriating this data and integrating it into UT Austin's AI models, the competitive advantage and intrinsic value of Surtek's proprietary data have been unlawfully compromised.

82.    On information and belief, UT Austin maintains databases accessible to commercial entities, including alumni who operate businesses. Surtek now knows that Surtek's Trade Secrets continue to be stored on these databases, from which Surtek contends, on information and belief, UT Austin derives a commercial and financial benefit.

83.    On information and belief, Defendants utilized Surtek's Trade Secrets that they obtained from Dr. Pitts to improve the UTCHEM model. UTCHEM is utilized for chemical EOR, and Surtek's real-world data would significantly benefit the model.

84.    Surtek did not discover that Surtek's Trade Secrets had been sent *en mass* until May of 2023, when its President and CEO, Elio Dean, reviewed Dr. Pitts' emails and found the above-referenced emails.

**E.    Surtek's Attempts to Claw Back Its Trade Secrets from Defendants**

85.    In the early months of 2023, Dr. Al-Murayri informed Surtek that he and Dr. Pitts were in violation of Dr. Pitts' noncompete agreement.

86.    Surtek reviewed Pitts' server emails and discovered the damage.  On August 1, 2023, Surtek filed suit against Dr. Pitts in Denver County, Colorado, in Denver District

Court No. 2023 CV 32241 (the **Pitts Lawsuit**), asserting various theories of recovery for damages and injunctive relief against Dr. Pitts for his tortious actions and other breaches of contract against Surtek.

87.    Following a six (6) day bench trial, the Denver District Court entered a final judgment finding Dr. Pitts had violated the Colorado Trade Secrets Act and breached his fiduciary duties to Surtek by sending Surtek's Trade Secrets to Mr. Abdullah and Dr. Delshad.

88.    In particular, the Denver Court ruled that it "did not receive credible evidence from Dr. Pitts to contest Surtek's position that the materials sent to the University of Texas are anything other than trade secrets."

89.    The Pitts Lawsuit concluded in Surtek's favor with the following findings: (1) Dr. Pitts violated the Colorado Trade Secrets Act by transmitting Surtek's confidential data, including proprietary reports, spreadsheets, and methodologies to UT Austin's faculty and researchers; (2) the materials sent by Dr. Pitts to UT Austin's faculty and researchers qualified as trade secrets and the materials were sent and received without Surtek's authorization; (3) the unauthorized dissemination of Surtek's Trade Secrets significantly impacted Surtek's competitive position, leading to financial losses; and (4) Abdullah, while a graduate student at UT Austin, received Surtek's proprietary data and his subsequent leadership at Kuwait University Lab Services was directly facilitated by access to these trade secrets.

90.     While Surtek received a monetary judgment from the Pitts Lawsuit, it was not made whole from the proceeding, nor did the Pitts Lawsuit remedy the ongoing violations of federal law that persist today by UT Austin's employees.

91.     During the litigation against Dr. Pitts, it was discovered that Dr. Al-Murayri of UT Austin had been improperly disseminating Surtek's and KOC's trade secrets, along with confidential information from several other entities, including: (1) Shell Kuwait Exploration and Production; (2) BP Exploration Company; (3) Kemira Group; (4) Schlumberger Well Services Kuwait; (5) Ultimate EOR; (6) Baker Hughes; (7) Saudi Arabian Chevron; and (8) Kuwait Gulf Oil Company.

92.     On information and belief, Dr. Al-Murayri was misappropriating trade secrets from Surtek and other companies in collaboration with Dr. Delshad, engaging in conduct similar to that which he perpetrated in the Pitts Lawsuit.

93.     On information and belief, Surtek is just one of many companies from which Dr. Al-Murayri and Dr. Delshad appropriated trade secrets and funneled information to Abdullah and Kuwait University to establish a competitor, thereby taking advantage of Kuwait's large investment in chemical EOR.

94.     Surtek has made numerous demands on UT Austin to return and discard Surtek's Trade Secrets received from Dr. Pitts.

95.     In April 2024, Surtek sent UT Austin a request for information to determine what, if anything, had been done with Surtek's Trade Secrets sent to Dr. Delshad and Abdullah so it could request that they be removed from any public databases.

96.    The Office of the Vice President for Legal Affairs at UT responded to Surtek's request by directing it to make a public records request and refusing to discuss the matter further outside of a public records request.

97.    Surtek made a public records request for information related to Surtek's Trade Secrets that Dr. Pitts sent to Dr. Delshad and Mr. Abdullah.

98.    After more than six (6) months and follow-up by Surtek, UT Austin produced records that revealed UT Austin used Surtek's Trade Secrets to calibrate its AI model and remain within UT Austin's databases that, presumably, anyone from the public can gain access to via a similar public records request.

99.    Despite providing some information, UT Austin has still not provided documentation to determine who or what persons or companies have accessed Surtek's Trade Secrets. Such documents and information not provided include, but are not limited to, Abdullah's dissertation, which was based on Surtek's Trade Secrets material.

100.    Although Dr. Pitts was ordered to provide some compensation to Surtek for the damage caused by his taking of Surtek's Trade Secrets as part of the Colorado lawsuit, Surtek has not been made whole for the continued use of its trade secrets by unauthorized third parties.

101.    UT Austin has actively prevented Surtek from discovering its damages.

102.    UT Austin refuses to disclose to Surtek what UT Austin, the UT System Board of Regents, Mr. Abdullah, and Dr. Delshad have done with Surtek's Trade Secrets.

103.    On information and belief, Dr. Delshad, Dr. Balhoff, and UT Austin took Surtek's Trade Secrets, which they received through unauthorized disclosure by Dr. Pitts, and then uploaded them into ML/AI models created and maintained by UT Austin.

104.    In essence, Defendants have built their ML/AI models by feeding those models Surtek's Trade Secrets.  Once uploaded to the ML/AI models, UT Austin gave access to those models to paying licensees for use in commercial enhanced oil recovery projects.

105.    On information and belief, UT Austin, UT System Board of Regents, and Dr. Delshad have continued to violate Surtek's trade secret privileges by making Surtek's Trade Secrets available to other unauthorized third parties.

106.    On information and belief, UT Austin, UT System Board of Regents, and Dr. Delshad have benefited financially from the misappropriation of Surtek's Trade Secrets.

107.    On information and belief, the trade secrets appropriated by Defendants are now being utilized in interstate and foreign commerce by Surtek's competitors.

108.    Surtek reserves the right to amend its pleadings once it can obtain further discovery of the use of its trade secrets, if any, made by UT Austin, the UT System Board of Regents, Dr. Delshad, Dr. Balhoff, or others who obtained Surtek's Trade Secrets as a result of their actions.

## IV.    CAUSE OF ACTION

### Violations of the Federal
### Defend Trade Secrets Act (DTSA)

109.    Plaintiff incorporates the foregoing paragraphs by reference as though fully stated herein.

110.    The Defend Trade Secrets Act of 2016 (**DTSA**) provides a civil cause of action for an owner of a trade secret that is misappropriated if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C.A. §1836(b)(1).

111.    Defendants do not enjoy sovereign immunity from a DTSA claim that requests prospective injunctive relief (*i.e.,* to enjoin state officials' ongoing violations of federal law)—which Plaintiff seeks here.

112.    The trade secrets at issue are owned by Surtek and are intended for use in interstate or foreign commerce.  Surtek took reasonable measures to keep the information secret, including, but not limited, requiring the execution of NDAs by employees who had access to such information.

113.    The information at issue derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain value from the disclosure or use of that information.

114.    Defendants engaged in the "misappropriation" of Surtek's Trade Secrets as that term is defined in the DTSA.  18 U.S.C.A. §1839(5).

115.    Dr. Pitts had actual knowledge that he was prohibited from disclosing Surtek's Trade Secrets by virtue of the NDA he drafted and signed.

116.    Still, he disseminated Surtek's Trade Secrets in flagrant disregard of the NDA and his fiduciary duties to Surtek.

117. On information and belief and for the reasons stated herein, Defendants knew or had reason to know that Surtek's Trade Secrets were acquired by improper means.

118. Surtek requests the Court grant an injunction to prevent any further misappropriation of Surtek's Trade Secrets pursuant to U.S.C.A. §1836(b)(3)(A), including, as necessary, requiring affirmative actions be taken to protect Surtek's Trade Secrets.

## V.    JURY DEMAND

119. Surtek requests a trial by jury for this proceeding.

## VI.    PRAYER

WHEREFORE, Plaintiff, Surtek, Inc., respectfully requests that this Court enter judgment in its favor and against Defendants Dr. Mojdeh Delshad, Dr. Matthew Balhoff, The University of Texas at Austin, and the Board of Regents of the University of Texas System, issue a temporary and permanent injunction that prohibits Defendants from continuing to use Surtek's Trade Secrets, and award Plaintiff such other and further relief as this Court deems just under the circumstances.

Respectfully submitted this 4th day of June 2025.

Respectfully submitted,

_____/s/ Benjamin D. Evans_____
Benjamin D. Evans
State Bar No. 24081285
bevans@cstrial.com
Ashley N. Morgan
State Bar No. 24091339
amorgan@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

**ATTORNEYS FOR SURTEK, INC.**

**CERTIFICATE OF SERVICE**

I certify that on June 4th, 2025, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

William H. Farrell                                        ***Via E-mail***: Bill.farrell@oag.texas.gov
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Bill.farrell@oag.texas.gov
***Counsel for Defendants***

_____/s/Benjamin D. Evans_____
Benjamin D. Evans

- 26 -